Rcv'd by: _____

KOH
PDK/FRAUD: USAO 2024R00365

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * CRIMINAL NO. |
| | * |
| PAUL ANTHONY YOUNG, | * (Conspiracy to Commit Bribery of a |
| | * Public Official, 18 U.S.C. § 371; |
| Defendant | * Forfeiture, 18 U.S.C. § 981(a)(1)(C), |
| | * 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c)) |
| | * |

*******

## INFORMATION

### COUNT ONE
### (Conspiracy to Commit Bribery of a Public Official)

The United States of America charges that:

#### Introduction

At all times relevant to this Information, with all dates being approximate and inclusive:

1. The defendant, **PAUL ANTHONY YOUNG ("YOUNG")**, a Maryland resident, was the president of ▇▇▇▇ ("▇▇▇▇"), which contracted with United States government agencies to provide Information Technology services, and which maintained its headquarters in Fulton, Maryland.

2. Coconspirator ("CC")-1, a Maryland resident, was a contracting officer at the United States Agency for International Development ("USAID"), and as such, a public official as defined in Title 18, United States Code, Section 201(a)(1). USAID was a government agency headquartered in Washington, D.C., which led the United States Government's international development and disaster assistance to save lives, reduce poverty, strengthen democratic governance, and help people emerge from humanitarian crises. CC-1 was friends with **YOUNG**.

3. CC-2, a Florida resident, was the president of Company 2. Company 2 contracted with government agencies, including USAID, to provide administrative and technology services. Company 2 maintained its headquarters in Washington, D.C. **YOUNG** was friends with CC-2 whom he introduced to CC-1. At times, CC-2's company, Company 2, hired ▮ **YOUNG**'s company, as a subcontractor on government contracts. Since 2004, the U.S. government has obligated approximately $271 million in funds in connection with Company 2's prime contracts with the U.S. government.

4. CC-3, a Maryland resident, was the founder, owner, and president of Company 3. Company 3 contracted with government agencies, including USAID, to provide consulting and other services and maintained its headquarters in Towson, Maryland. At times, Company 3 also provided contract support to USAID in connection with its mission to provide humanitarian aid, such as a $100 million purchase agreement for humanitarian aid and support across Ukraine. **YOUNG** was friends with CC-3. At times, CC-3's company, Company 3, hired ▮, **YOUNG**'s company, and Company 2, CC-2's company, as subcontractors on USAID contracts. Since 2015, the U.S. government has obligated approximately $198 million in funds in connection with Company 3's prime contracts with the U.S. government.

5. ▮ CC-4 worked at Company 2 and then was hired by USAID where CC-4 eventually became a contracting officer.

### The Conspiracy

6. Between in and around 2013 and in and around 2023, in the District of Maryland and elsewhere, the defendant,

**PAUL ANTHONY YOUNG,**

did knowingly combine, conspire, confederate, and agree with CC-1, CC-2, CC-3, CC-4, and

others known and unknown, to commit an offense against the United States, namely, bribery of a public official, that is, to corruptly give a thing of value to a public official with intent to influence an official act, in violation of 18 U.S.C. § 201(b)(1)(A).

### Manner and Means

7. It was part of the conspiracy that **YOUNG** and his coconspirators bribed CC-1, a public official, repeatedly—through multiple payments and other things of value, gifts, and favors—with intent to influence at least one official act, namely, the award of USAID contracts valued at hundreds of millions of dollars to CC-2's company, Company 2, and CC-3's company, Company 3.

8. The conspiracy involved at least 14 USAID prime contracts valued at approximately $524.7 million, including:

   a. between in and around 2013 and in and around 2015, the award of four contracts to Company 2 valued at approximately $45.8 million;

   b. between in and around 2018 and in and around 2022, the award of seven contracts to Company 3 valued at approximately $211 million; and

   c. between in and around 2022 and in and around 2023, the potential award of three contracts to Company 3 valued at approximately $286.8 million, two of which have not been awarded, and a third that was not awarded to Company 3.

9. It was part of the conspiracy that **YOUNG** obtained subcontracts through Company 2 and Company 3 on government prime contracts with USAID.

### Overt Acts

10. In furtherance of the conspiracy, and to effect the object of the conspiracy, the following overt acts, among others, were committed in the District of Maryland and elsewhere:

a. On or about June 6, 2014, CC-1 texted **YOUNG**, "I had a long talk with [CC-2.] We need to talk about the potential money losses you are incurring and the fact you're not filthy rich[.]" **YOUNG** replied, "I could/would be making a lot of money." CC-1 replied, "[T]he fact I have to ask you for money for BS stuff bothers the hell out of me ... Like I'm not smart enough to make millions for sourcing contracts[.]" **YOUNG** replied, "Believe me time will come." CC-1 replied that with "mounting debt I almost asked [CC-2] for a loan .... Or advance[.]"

b. On or around August 8, 2014, a few weeks before Company 2 was awarded its second USAID contract, CC-2 discussed with **YOUNG** ways to conceal the bribe payments to CC-1. CC-2 texted **YOUNG**, "[I]f possible, give it to some other third party to give him. That way you can honestly say you never gave him anything ... never give anything but cash to you know who."

c. On or about October 2, 2015, CC-2 stated in a text message to **YOUNG**, "You know you can bill me an 'administrative fee'. How much was it?" After **YOUNG** replied that it was $2,000, CC-2 stated, "Let's talk today about your next invoice to me." These text messages concerned **YOUNG** purchasing a laptop for CC-1 on behalf of CC-2 in furtherance of the conspiracy.

d. On or about September 26, 2016, **YOUNG** texted CC-3, "I was told by [CC-1] to play this game because millions are involved so I am." Three days later (on or about September 29, 2016), **YOUNG** sent a text to CC-3 stating that CC-2 "[did not] want to do anymore pay to play." Nevertheless, CC-2 continued to funnel bribe payments to CC-1 via **YOUNG**. As a result, CC-2 and Company 2, as well as **YOUNG** and ▓▓▓▓, subsequently

4

received subcontracts from Company 3 to work on its USAID contracts. In addition, **YOUNG** began making payments from CC-3 to CC-1.

e. On or about March 28, 2018, CC-1 emailed CC-3 and **YOUNG** procurement-sensitive information regarding the capabilities of companies to complete a government contract.

f. On or about March 29, 2018, on or about the day after CC-1 shared the procurement sensitive information, **YOUNG** texted CC-3 about purchasing a suite to watch a basketball game in Washington, D.C., "$3000 for the suite next Friday. You good?" CC-3 replied, "Call me[.]" **YOUNG** later texted CC-1, "Don't be asking questions. Getting a suite for the [W]izards game." CC-1 replied, "Phase One has been approved to start[.]"

g. On or about September 10, 2018, CC-1 emailed CC-3 a contract award, formally referring to CC-3 as "Mr." and stating: "Please also provide times . . . for you and your firm to meet for a formal award kickoff meeting with me and the cognizant Contracting Officers Representative. Congratulations on your award and your future work with USAID." In awarding this second contract to Company 3, CC-1 blind carbon copied **YOUNG** on this email. CC-1 also blind carbon copied an email account for a shell company that CC-1 incorporated, which CC-1 used to submit fake invoices to **YOUNG** to receive and conceal bribe payments.

h. On or about January 13, 2020, CC-1 emailed CC-3 and blind carbon copied **YOUNG**. The email included a document entitled, "USAID endorsement letter to ▊ ▊." This was an official USAID letter from CC-1 to CC-3 and Company 3, which stated Company 3 was "requesting to add [▊] to this contract as a sub-contractor." The letter further stated: "It is to my [CC-1's] understanding that [▊] brings a capability in agile solutions and IT managed services which will support [Company 3] in satisfying their

5

contractual requirements on both the unclassified side and classified support side up to Top Secret level support." Ultimately, CC-1 concluded that CC-2 and Company 2's "request to have [▇▇▇▇▇▇] as a subcontractor for the referenced award is **hereby approved**" (emphasis in the original).

    i.    On or about June 30, 2021, **YOUNG** invoiced Company 3 for "Impact International Services LLC JV Implementation Jun [sic] 2021" and charged $34,500. Impact International Services was a company **YOUNG** had recently incorporated. Using this company, **YOUNG** concealed bribe payments to CC-1 that originated from CC-3 and Company 3.

    j.    On or about August 11, 2022, CC-1 provided CC-3 with a technical evaluation package containing confidential information regarding the status of proposals Company 3's competitors submitted for the award of a contract with a total value of approximately $135 million. The package contained confidential source selection information, including USAID's assessment of the strengths and weaknesses of bids, which indicated Company 3 was not the top candidate.

    k.    Between on or about October 21, 2022, and on or about October 24, 2022, as the evaluation of bids continued, CC-1 and CC-4 received approximately $60,000 in two separate transfers from **YOUNG**, which **YOUNG** received from CC-3, and which CC-1 [▇▇▇▇] used to make a downpayment on a residential mortgage.

18 U.S.C. § 371

6

## FORFEITURE ALLEGATION

The United States of America further alleges that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c) in the event of the defendant's conviction under Count One of this Information.

2. Upon conviction of the offense alleged in Count One of this Information, the defendant,

**PAUL ANTHONY YOUNG,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

### Substitute Assets

3. If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

Date:  June 10, 2024

/s/ Glenn S. Leon
Glenn S. Leon
Chief
United States Department of Justice
Criminal Division, Fraud Section

Date:  June 10, 2024

Erek L. Barron
United States Attorney
United States Attorney's Office
District of Maryland